of America, and I would like to see 50 minutes of silence, Mr. Shad. Good morning, your honors. May it please the court, I'm here this morning representing Mr. Napier, and I'd like to reserve three minutes for rebuttal, if I may. All right. Your honors, the Federal Public Defender's Office for the Southern District of Ohio and the United States Attorney's Office for the Southern District of Ohio enjoy a very good working relationship. I've had the pleasure of handling cases throughout the country when I was in private practice, and since I've been before this court, I've handled cases outside of the Southern District of Ohio on appeal. And I can tell you that just from that informal survey, we've got it really good in the Southern District of Ohio. For the most part, everyone likes each other. We work together. It is a very, very good working relationship. And that is part of what makes today's oral argument difficult to discuss. I'd like to switch right away, as you can guess, to my issue number two, which is the due process violation which occurred in this case. Well, I mean, I have to confess, I'm struggling a little bit to see, frankly, what the big deal is about this. And can you distill it, you know, into a sentence or two, the essence of what is so offensive about this? Yes. And let me start by saying one thing that it's not. The issue of whether or not this particular AUSA in this case had a duty to provide the information to the local authorities, we would agree that it appears that she did, in fact, have a duty to do so. So we're not saying that that was any improper. What we're saying that occurred that was improper is two different things. Number one, that she was not permitted, either by statute or by case law, to transfer this defendant from one jail to another without any judicial intervention for purposes of this other investigation, that being an investigation that the AUSA's office was going to ultimately use in their federal case. And number two, that after this conduct came out, it wasn't disclosed, and it continued to not be disclosed for a very long period of time until really right before trial. But the judge reprimanded the AUSA, correct? Yes. And also precluded the use of any information from those interrogations in the federal trial, correct? Yes. And so while the AUSA's action might have been incorrect, how did that amount to a due process violation? That should affect the prosecution of this case or any of the other aspects of that general prosecution? Sure. And I think it goes to the whole concept when the Supreme Court alluded to this idea that there could be a due process violation, this outrageous governmental misconduct. It was not tied to a specific showing of prejudice. And there's a reason for that, is that the idea is that there can be some conduct which is so outside the scope of what is normal handling of a criminal case that kind of like if you want to take an analogous situation, it's kind of like a Fourth Amendment violation, a suppression violation. It's a prophylactic rule, right? And where there's a Fourth Amendment violation, even if sometimes there can't be prejudice proven, in order to correct the officer's conduct, there has to be this penalty that occurs. In this case, our argument is that, and Judge Donald, I will be quite frank with you, there is not a compelling argument to show actual prejudice in this case because of the two things that you cited to, that there was the reprimand and that the information wasn't able to be used. The issue going forward is, and I think I alluded to this in my brief, is what is to prevent this from occurring in the future? An example would be, let's say this all occurs the same way that it did in this case, but instead of the AUSA being aware of conduct that's in Hamilton County, Ohio, let's say she's aware of criminal conduct which occurs in Grand Rapids, Michigan. And we know that the Attorney General has an agreement with Nuevo County Jail, which is north of Grand Rapids. And so, can an AUSA, unilaterally, without judicial intervention, move a pretrial defendant from Boone County, Kentucky, up to Nuevo County, Michigan, so that the Nuevo County, Michigan authorities can investigate a case? I guess, I mean, you'll have to pardon my sort of lack of facility with some of this. That's where you're losing me. Like, the AUSA moves the person. Explain to me the mechanics of what you think happened here. Did she pick him up in a car? I mean, does she sign a piece of paper or something? What's going on here? The evidence is, and it came to light in, actually, the Cincinnati Police Department's detective report. The AUSA and the FBI agents actually had a sit-down with Cincinnati Police Department detectives on February the 6th, presented the case to them, showed them the information. That's totally fine. Totally fine. Four-year-olds. Exactly. No problem. And I think, at that point, the Cincinnati Police Department asked to get him there. And I can read to you from the report, if you'd like, the exact language. But, in essence, what it is, is that the AUSA said she will get him transferred to Hamilton County Jail. What I understand happened next is that she placed a call to the marshal's office and said— How does this normally happen? Well, it doesn't. That's the problem. It doesn't normally happen. I mean, that would be a writ issue, wouldn't it, to move that person from someplace if they needed to interview them? Absolutely. And that's what you're getting at, no judicial process. Somebody would have to get a writ and have them move. And you'd have a paper trail with all the protections and notice and all that. And our argument is, at a basic level, the United States Attorney's Office just doesn't have the authority to do this unilaterally. And they're even arguing on a— Judge Kettleman's question was, how does it happen? How do you make that movement? Right, right. And so who actually placed Mr. Napier in the vehicle, whatever the vehicle was, and got him from Boone County to Hamilton County? The record is not clear as to how that occurred. But what was the culpable action, in your view, by the AUSA with respect to him ending up in the custody of the Cincinnati police? The AUSA moving this person? That doesn't help me because she's not physically moving him. She ordered him to be moved from one location to another. Without any authority. In your view, she calls the marshals and says, take the guy over to the Cincinnati PD? Yes. As opposed—Judge Donald knows way more about this stuff than I do. As opposed to going to the district judge and saying, Judge, we want the Cincinnati PD to talk to him. We need a writ. And so in that scenario, his lawyer knows about it. He doesn't have to ask 17 times. That's correct. And let me throw in another caveat here, which is not going to be helpful, but I think to make sure that the picture is clear. Since he's in the custody of the United States marshals, he's a pretrial detainee. The marshals can, for various reasons, move him without judicial intervention. Let's say—and as a matter of fact, I think it's within the statute that my colleague cites to you, the 3712. So let's say he had a co-defendant, and it turns out that there were two co-defendants that are in the same jail together. And there could be an issue because one's testifying against another safety issue. Obviously, the marshal has the authority to move him to another facility for that safety reason. Could it possibly be a state facility or not a federal facility? Yeah. It's actually wherever they have this—they have certain contracts with county jails, with local jails, with federal facilities. It just depends on the situation. Does this boil down to the idea that you think the AUSA did this precisely because the Cincinnati officers would have a chance to question without counsel? Is that what this is driving at? Yes. Yes. I think that is the allegation. And the reason that we say that is that, number one, it's clear that the CPD, the Cincinnati Police Department, was going to talk about factual events that related exactly to the federal case. The only information they had at that point, practically, was the federal case and the evidence that this AUSA and the FBI agents provided to the Cincinnati Police Department. So is that information going to come up? Certainly. Number two, when it was found out that this, in fact, had occurred, it was disclosed that the investigation or that the interview occurred, but at the same time was also disclosed, hey, we're not going to use this in the case in chief, but we will use it in rebuttal if your guy testifies. So it was—what else were we to think at that point after that was the allegation? Then on top of that, we have the fact that throughout this process, the full truth of what occurred doesn't come out. I think, as I stated in my brief, the Cincinnati Police reports were redacted, and they were redacted in such a way, but the part where the AUSA referred the case to the Cincinnati Police Department in all of those meetings and discussions, that was redacted until November of 2013, right before trial. I mean, that part is totally innocuous, right? I mean, it's totally fine that she's telling the Cincinnati officers that this guy apparently raped some extremely young kids. Absolutely. I mean, it's like they redacted that some other—I can never come up with examples—harmless thing. I mean, that one, why isn't that just— It's innocuous in and of itself, but when you put it in the context of everything else that occurred in the case— again, remember, this AUSA was asked point blank by a magistrate judge and a district court judge shortly after this transfer occurred. If she was merely doing her duty, why didn't she say to the court at that time, hey, I had a duty to disclose this, so here's what I did. Mr. Shedd, my question. What is the precise relief that you see, and what is it in this record precisely that justifies that relief being awarded? The first part of the question is much easier. But what I'm asking for is the dismissal of the indictment with prejudice. It's a very, very—it's a harsh remedy for this violation. The reason for this is that we do not want this conduct to occur again. There has to be some way of assuring that it doesn't occur again. And this court has the ability under its authority through a prophylactic rule to create that kind of a remedy. I have to say, it's one thing if it's a trespassing case. Do we take into account the nature of this indictment before we decide to just dismiss it? I'm asking you honestly. I'm not trying to be rhetorical. Or is that sort of an illegitimate consideration? I don't know that it can be a legitimate consideration. Let's say it is a trespass case, and the same exact conduct occurs with the prosecutor. Does that change what the prosecutor did or didn't do or should or should have not done? It doesn't. Is this more of an—I mean, I have to say, I'm still struggling to see why this is so terribly egregious. But isn't this more of an equitable—is there any equitable aspect to this sort of determination? Or is it this rigid, OK, if it's a certain bad amount of conduct, we get rid of the indictment. And even if it's Charles Manson, turn him loose, and we've got to keep the system pure. In this case, as an aside to that, even in the Charles Manson case or in our cases especially, we have a pending state indictment, so it's not that this person goes free. It's just that the state prosecutes him for the rapes. But to answer your question, in Fourth Amendment cases, we don't weigh the severity of the underlying conduct or the offense. And the reason that we don't do it is because we're trying to correct police officer misbehavior. That's a good answer. All right. Thank you, Your Honor. Thank you. May it please the Court. Ben Glassman on behalf of the United States. I would like to discuss the mechanics answering Judge Kethledge's and Judge Donald's questions. But at the outset, I want to make clear that there is no authority whatsoever for the proposition that an indictment for anything should be dismissed on the grounds that an AUSA asked the marshals to transfer somebody from one pretrial detention facility to another pretrial detention facility. Regardless of the purpose or the motive for the transfer. Right. I think my colleague more or less conceded that this would be the first such rule that this Court would be creating ever. If there even is the remedy for anything of dismissing an indictment with prejudice, I'm not sure there is, but surely this is not outrageous government misconduct that shocks the conscience. Mr. Shedd says that when there is egregious, outrageous conduct by the AUSA that affects the process, something has to be done. What's the appropriate remedy? Because surely we don't sanction inappropriate AUSA conduct. And I'm not characterizing this one way or the other, but if the Court finds that there is this outrageous, inappropriate conduct that affects the process, what's the appropriate remedy? Is it what the Judge did here? I think what the Judge did here was more than adequate. What the Judge did here, and I think the Judge characterized in her order as clearly covers, solves whatever Sixth Amendment violation or Fifth Amendment violation is even alleged. And does that take care of Mr. Shedd's concern that appropriate measures be taken to prevent this from happening in the future? Does that take care of that also? I mean, to the extent that it's appropriate for the District Judge to try to control that sort of process going forward, it seems to me that it would be more appropriate. What we're looking for here is a fair trial for Mr. Napier. We're not looking to govern through a criminal case how the U.S. Attorney's Office and the Federal Public Defender's Office communicate with each other. That's not something that should be resolved by a District Court in a motion to dismiss an indictment. That would be something for the Chief Judge of the District, I think, to sit down with the U.S. Attorney and the Federal Public Defender to discuss. I don't think that it has anything to do with this case. What is the government's explanation of the reason or purpose of the transfer? As I understand it, and this is not in the record which I want to come back to, but as I understand it, it was simply a courtesy. The best I can say in the record is if you look at the transcript of the initial appearance or the first scheduling conference, both of which are transcribed in the record, the AUSA says it was for the Cincinnati Police wanted to process Napier, and it was easier for them to do that. I mean, there's nothing really to stop Cincinnati Police officers from going over to Boone County and interviewing Napier. I guess the thing that then casts some concerns or doubt is the AUSA's communication with the judge where it appears that she was not completely forthcoming about either her knowledge or her involvement in that process. I would disagree with that characterization, Judge Donald, and I would submit that the court should look at the transcripts. If you look at the transcript of the first hearing before the magistrate judge on the initial appearance, the defense counsel raises the issue of the transfer, and specifically what bugged defense counsel at the time, it appears from the transcript, was that the defendant was taken to this bond hearing in state court where there were media present, and the AUSA says he shouldn't have been taken to the bond hearing. There was no writ. I've contacted the state prosecutor, and they assure me that's not going to happen again. The assistant federal public defender then says to the magistrate judge, well, I understand that he was transferred from one facility to another at the request of the AUSA. That's raised there, and then he goes on to say, but if he's going back to Boone County, that's fine. Then we're happy with that. That's where the matter was left at the initial appearance. With respect to the scheduling conference, what the AUSA was asked about was, again, the bond hearing, and the question was, as you'll see on the transcript, that the district court was trying to ascertain, trying to verify that the federal government had primary jurisdiction and hadn't relinquished custody of the defendant to the state. Upon learning that that had not happened, said, okay, I guess we do have primary jurisdiction. The AUSA did not mislead the court. If you read the questions in context, the AUSA answers the questions asked. The focus of the questions had to do with, why is this guy going to a bond hearing without a writ? The answer was, he shouldn't have, and I didn't know about it until after the fact. Wait a minute. See, this is where I start. I'm like, I don't understand what the heck's going on here. Yeah. So the AUSA tells the marshals, bring him over to the Cincinnati PD, right? No. The AUSA- He ends up sitting with the Cincinnati PD. What happens- How does that happen? Okay, so what happens is he comes in and he's ordered detained when he's arrested. Once he's ordered detained, he's ordered into the custody per the statute of the attorney general. And the way that happens is then the marshals then detain the defendant in a facility. They're all local facilities. They don't go to a federal prison to be detained. A local facility with whom the marshals have a contract. In this case, he happened to go to one in Kentucky. This is the boomer? Yes, right. The AUSA then says to the marshals, hey, you know, Cincinnati police want to process him. Can you move him to someplace more convenient for them? They say, sure. We might have just as easily put him in Hamilton County in Ohio as we did in Boone. We'll just switch him to Hamilton County. So they switch him to Hamilton County. Is that what's happening here? Yes. Right. So the U.S. attorney tells the marshals, just take him over to Hamilton. Cincinnati PD wants to talk to him. Is that right? Yes. Okay. Yeah, I don't... In a sense, it's sort of a permanent transfer over to Hamilton at this point? Well, I mean, pretrial detainees can be moved to any facility within the system, and it actually happens quite regularly. There are not normally writs. The writs are issued if you want to actually bring the person to a state proceeding, like a hearing. But people can be moved summarily. That was the Supreme Court case that I cited. So he gets moved to Cincinnati. The immediate reason for that was to get processed by the Cincinnati PD. But he remains in Cincinnati, and then they've got... It comes time for a bond hearing in Hamilton County, I guess. No. What happened there was he comes over to Hamilton County, and the Cincinnati police process him and, as I understand it, interview him... Right. ...with respect to the state charges. And then the jailer at the Hamilton County Justice Center didn't bother to check as to whether or not the person remained in federal custody or in state custody, so they took him without a writ to a bond hearing on the state charge. While he's still over in Hamilton. Well, Hamilton County is... We're in Hamilton County right now. Yeah. Yeah. While he was still in federal custody. Exactly. That was the error. But that wasn't something... Number one, that wasn't an error that the AUSA was trying to bring about. And number two, it certainly is not some kind of due process violation that affects Mr. Napier's rights in any way. When this was argued to the district court in terms of the due process issue... Yeah. ...was the harm that gave rise to the egregiousness? Was it the interrogation without counsel, or was it the appearance at the bond hearing? Your Honor, I apologize. I really have struggled to discern what is the harm that's been argued, and I can't really discern it either. I mean, this happened in February, and then the motion was eventually filed in October, and then it was argued, I think, in November or December. And I will say, though, with respect to the argument on the motion, Napier had the opportunity, if he wanted to, to present evidence as to all of these facts, and he did not. And, I mean, now he's in a position where he's arguing about inferences from, well, what could have been the AUSA's motivation or so on. If you read the government's post-hearing response to the argument, the government says, hey, look, maybe you should have called the Cincinnati police detective as a witness so that that person could have been cross-examined by asking, didn't the AUSA instruct you not to ask any questions about the federal charge? But Napier chose not to call any witnesses or develop any evidence. So it's just his argument on the facts as we've stated them. And there is just no authority in support of dismissing the indictment. In fact, I do want to say that there was some insinuation that there was something nefarious about the government saying that it reserved the right to use his statements, not in its case in chief, but to impeach his testimony. Well, if evidence is developed in violation of the defendant's Sixth Amendment rights, the Supreme Court has held that the remedy is suppression from the case in chief, but has also specifically held that you can use it to impeach his testimony if he gets up and testifies inconsistently. So there's nothing wrong with the government taking that position. The district court went a step further and said you can't even do that, and the government did not appeal. But, I mean, there's just no cause for anything more than that, certainly. In the government's view, there was not misconduct. Perhaps there was a departure from a norm of civility in federal practice or a norm of courtesy, but not any violation of Napier's rights at all, much less one that was so shocking to the universal sense of justice that it would warrant dismissal of the indictment with prejudice, an absolutely unprecedented remedy. If there are no further questions on that issue, I would be happy to address any questions about sufficiency of the evidence, about the evidentiary issues, or the count 11 issue that the court may have. The government seems to have made this a closer case on the commerce travel issue than it appears one might expect. Yeah, you know, I think that probably the last argument in the section of that argument should have been the first, that, as most courts have said, look, you transmit something over the Internet, that is interstate commerce right there. And in this case, not only was that obvious and undisputed, although we put that last in the argument of the brief, but confirming that is the fact, again, also undisputed, that the images that he created here in Cincinnati came back, when a search warrant was executed, came back from California. I don't quite follow that. I mean, you have a document from a custodian in California, but that doesn't mean the server is there, does it? No, it doesn't mean the server is there, but it means that the documents, the images came back from California where the custodian sent them from. I mean, the custodian says, here, these are attached. Right, but, I mean, isn't it true that the interstate travel has to be part of the offense itself as opposed to something that is done in response to a federal subpoena later? Well, this is a search warrant. This was a search warrant. Maybe I'm just having a hard time with the mechanics of this case. No, no, it doesn't, because think about it. It's the standard thing of, hey, if something was created in one state and it is found present in a different state at some point. Where is it found? I mean, I don't get it. I mean, the custodian's in California. Right. Let's say the server's in Ohio, hypothetically. I know it's probably not true and you wouldn't agree with that, but let's say it's in Ohio, and then in response to the search warrant, the custodian checks the servers and accesses an image from the Ohio server and says, okay, yeah, we do have it. Well, I mean, there had been no interstate travel until responding to the search warrant. So that question actually suggests a doctrine that's been called manufactured jurisdiction following... That's kind of what I'm thinking of. Yeah, yeah. Why isn't this an instance of that? Well, there's no evidence of that. There's no evidence of that. Do you have evidence that it's not that? I mean, where is the evidence? Does this boil down to the time stamp at the end of the day? Is that really the best you have? Well, I think the best we have is that it was all sent over the Internet, which in and of itself is sending it in interstate commerce. Do you have a case that says that? Oh, sure, yeah. Well, it's actually cited in the last case that's cited in the brief is Runyon, but there's also McEwen from the Third Circuit, Lewis from the First Circuit. So there are cases that say sort of per se interstate travel once you've... Yeah, now I'll say, I mean... I'm sure it's in there. Just to be very candid with the court, I mean, there are some cases that have said, no, that's not the case, that it's per se. I'm aware of one from the Tenth Circuit that said, oh, no, that's not per se, at least where there is undisputed evidence that the images stayed in the one state the whole time. Okay. Thank you, Your Honor. Thank you. Thanks. Okay, I have a lot to get through in three minutes here. You can go ahead. Let's do the sufficiency first. You know, I cited to a Ninth Circuit case that's kind of right on point where the guy used lime wire and he sent it to an undercover agent. He was in Arizona, the agent was in Arizona, and there wasn't evidence presented that it bounced out to a different state, and they overturned the convictions on that. The mere use of the Internet can't be enough because, in this case, it was charged with crossed state lines, not interstate, not got into the stream of interstate commerce. If you think of it like a car and you don't have the evidence that the car was manufactured in Michigan, the only evidence you have is that it got on I-71 at some point while it was in Ohio. That's not enough to prove the interstate commerce element of like a carjacking statute, that it merely got on a highway. It's that it crossed state lines at some point, same way with the firearm, right, and an ammunition. And a high point in Ohio is manufactured in Ohio. But unless you show that it crossed state lines, the fact that somebody drove it down the road on an interstate highway is not enough. I'll admit that the Fifth Circuit case says that, but in this case, the jury instructions and the government conceded in this particular case that they had to prove that it actually crossed state lines, not that it had the ability to. There's not evidence other than you get back down to the timestamps. There's no evidence of that in this case. The custodial records aren't enough because they never say that they got them from their servers in California. There's just a lack of evidence, and that's going to tank counts 2 through 9 of the indictment in this case. On the timestamps, you say, well, you know, there are lots of ways that could have happened. You know, in my watch, I could change my watch to Pacific time. Before that, it's more than that, because if I had this on right now, I have the weather for London. I have the weather for London, England. And if I pulled it up, it would say plus 6 hours right now. It would show you that right now at, what is it now, 11 o'clock, so it would be like 5 o'clock. It would say 5 p.m. London time, and here's the weather. Does that mean that somehow this or the transmission is going over to London? No. No, but, I mean, you know the rule that says the government does not have to eliminate every hypothesis of guilt. Absolutely. When you have something that, in fact, seems very common and likely to happen anyway, and then you have some evidence corroborating that chances are it did, i.e. the timestamp. I mean, why shouldn't that be enough? Why shouldn't this, you know, watch your phone idea, why shouldn't that be more something the defendant would have to cough up at trial and say, let me almost disprove it? It's obviously an element that they need to prove beyond a reasonable doubt. It's one of the elements of the offense. It's not like venue or anything like that, right? So the issue is, yeah, it comes down to it, and it is the same issue. Is that enough? Is just showing a specific time code enough to get us interstate travel in this case? And if so, where did it go? Where did it go? And where did it come back from? That's somewhere. Somewhere. Yes. It went to, you know, San Francisco. Right. I'm out of time. If I could have just one minute on the issue of my first issue. Well, make it a half minute. Okay, I will do it. The counsel argues that they were just the CPD was just going to process Napier, and that was the reason he was transferred over was to process, and that's what the AUSA in this case said to the district court, too, that CPD was just going to process it. But if you look at the actual notes from the Cincinnati Police Department, it says, I spoke with her regarding the transfer of Mr. Napier to Hamilton County to simplify matters in regards to my interviewing and executing a search warrant for his vehicle swab and photos. She will request the marshals transport him to the Hamilton County Justice Center on 2713. It wasn't merely to process him, and this is evidence of that. I don't know. That just doesn't sound like the equivalent of stomach pumping to me, what you just read. Well, I understand. But maybe it's my own ignorance. I don't know. Thank you, Your Honor. Thank you. The case is submitted.